UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SUDHIR KAPOOR,                          )<br>       Plaintiff,                          )<br>                                                    )<br>  vs.                                              )<br>                                                    )<br>THE INDIANA UNIVERSITY BOARD     )<br>OF TRUSTEES, MEREDITH HULL,      )<br>DAVID CRABB, LIA S. LOGIO,           )<br>LILLIAN CHARLESTON,                   )<br>       Defendants.                       ) | 1:06-cv-819-LJM-WGH |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendants', the Indiana University Board of Trustees, Meredith Hull, David Crabb, Lia S. Logio, and Lillian Charleston, individually and in their official capacity (collectively "Defendants" or "IU"), Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff, Sudhir Kapoor ("Plaintiff" or "Kapoor"), filed this action against IU alleging unlawful discrimination on the basis of national origin and race, retaliation, violation of due process, and breach of contract. The Court has fully considered parties' arguments and, for the reasons discussed below, **GRANTS** Defendants' Motion for Summary Judgment.

**I. BACKGROUND**

Indiana University is a university owned by the State of Indiana. Ind. Code § 20-12-23-1. IU's School of Medicine operates over seventy residency programs, including an internal medicine residency program. Def. Ex. 1, ¶ 3. Generally, residents are engaged by the School of Medicine

under the terms of a Letter of Appointment for a one-year term. Def. Ex. 2A, ¶ 5. Medical residents participating in IU's Internal Residency Program are trained at various hospitals in the greater Indianapolis area. *Id.* at ¶ 6. During the residency, individual residents are supervised by a Chief Resident at each hospital. *Id.* Chief Residents do not have the authority to take disciplinary or other employment actions in connection with residents. *Id.* Each resident's performance is evaluated by attending physicians, colleagues, medical students, nurses and other staff, and through the use of "praise cards" and "concern cards." *Id.* Additionally, the Resident Evaluation Committee, comprised of fourteen individuals, monitors residents and makes recommendations to each program's Director regarding the residents' clinical competence. *Id.* at ¶ 8.

Plaintiff transferred to Indiana University's Internal Medicine Residency Program in July of 2003 as a second-year post graduate resident. Pl. Ex. 2. As early as November 2003, IU began receiving complaints regarding Plaintiff's behavior. Def. Ex. 9, ¶ 4. In November of 2003, University Hospital's Chief Resident, Dr. John Scherschel ("Dr. Scherschel"), was approached by a female intern who complained that Plaintiff had touched her without her consent. *Id.* Specifically, she alleged that Kapoor adjusted her scarf and on another occasion he told her that "she looked good." *Id.*. Dr. Scherschel reported this complaint to Dr. Lia Logio, the Director of the Internal Medicine Residency Program at IU. *Id.*, Def. Ex. 2A, ¶ 2. Although Plaintiff disagrees with Defendants view as to the extent he touched the intern's scarf, he admits he touched the scarf and told the intern she looked good. Def. Ex. 6B, at 57-58. Dr. Logio met with Plaintiff to discuss the female intern's allegations and to instruct him he must avoid that sort of behavior in the future. Pl. Ex. 1.

After receiving the female intern's complaint, Dr. Scherschel sent an inquiry to fellow chief

residents at other hospitals asking if they had heard of any incidents of inappropriate behavior involving Plaintiff. Def. Ex. 9, ¶¶ 5-6. Dr. Scherschel received several responses. *Id.* One chief resident responded that he was aware of concerns raised by several attending physicians regarding Plaintiff's alleged laziness, moodiness, communication skills, and professionalism. *Id.* Others responded with varying complaints about Plaintiff's competence and the nature of his professionalism. *Id.*

According to Dr. Scherschel, in December of 2003, he received more complaints about Plaintiff's interactions with another intern. *Id.* at ¶ 7. The intern complained that Plaintiff told the intern that Plaintiff wanted to read and not be bothered with patient issues, that Plaintiff did not know the patients well, never wrote any notes on the patients, never examined any of the patients, and showed up at the bedside only when the attending was present. *Id.* Further, she complained that Plaintiff did not interact with the students; left each day by 3:00 p.m.; and became angry, and frightened the intern, when she raised these issues with Plaintiff. *Id.* Plaintiff denies these allegations. Def. Ex. 6B, at 62-66.

Also in December 2003, an attending physician in the VA Critical Care Unit in a formal evaluation of Kapoor wrote:

> Dr. Kapoor does not yet function at the PGY-2 level. I can't imagine how he could manage a housestaff team with interns beneath him. His fund of knowledge is marginal at best, and his clinical skills are also not up to standard. I am not very comfortable with his continuing through the program without serious remedial work.

Def. Ex. 2A, ¶ 11. However, as Plaintiff points out, other physicians in the same evaluation graded Plaintiff differently, giving plaintiff at least average scores. *Id.*

According to Dr. Scherschel, in May of 2004, several people, including an intern, attending

physician, nursing supervisor and nurse, reported that Plaintiff had been rude and unprofessional to a patient and nurse when he was called to supervise the placement of a peripheral line to draw blood from an oncology patient. Def. Ex. 9, ¶ 9. The patient submitted a formal complaint regarding Dr. Kapoor's behavior. Def. Ex. 35. However, the intern involved reported that Plaintiff had acted properly and professionally. Pl. Ex. 12.

In June 2004, Dr. Toan (Bob) Vu ("Dr. Vu"), the Junior Clerkship Director, submitted a "concern card" to Dr. Logio reporting that Plaintiff failed to submit student evaluations claiming he did not want to submit the evaluations until he knew what the students wrote in their evaluations of him. Def. Exs. 2, ¶ 13 and 27. According to Dr. Vu, Plaintiff argued with Dr. Vu for a period of two weeks before actually submitting the evaluation. *Id.* Dr. Logio emailed Plaintiff and instructed Plaintiff that observation and evaluation of medical students is required of residents and must be completed in a timely fashion. Def. Exs. 2, ¶ 13 and 27.

In July of 2004, IU received three more complaints of inappropriate conduct by Plaintiff. Def. Ex. 14, ¶¶ 4, 5, 9. Specifically, one nurse complained the Plaintiff grabbed her identification badge attached to her shirt between her breasts. Ex. 19, ¶ 5. She also complained that Plaintiff grabbed her arm. *Id.* A second nurse complained that Plaintiff touched her buttocks on two separate occasions. Def. Ex. 14, ¶¶ 4-5, 9. A third complained that Plaintiff ran a pen along the inside of her thigh while she was sitting with her feet propped up on the desk. *Id.* After learning of these complaints, Dr. Logio met with Plaintiff on July 24, 2004, to explain to him the seriousness of the allegation, and that she would be investigating the claims. Def. Ex. 2A, ¶ 14. Dr. Logio explained to Plaintiff that she would present all the allegations to him at a subsequent meeting, and that he was entitled to representation with an opportunity to respond. *Id.* Dr. Logio instructed Plaintiff she

4

would provide all the relevant information to the Medical Education Committee for final determination. *Id.* At a subsequent meeting, Dr. Logio presented Plaintiff with the allegations from the three complainants and afforded Plaintiff an opportunity to respond. Def. Ex. 30. Plaintiff denied all three allegations. *Id.* at ¶¶ 14-15.

Upon completion of her investigation, Dr. Logio sent Dr. Meredith Hull ("Dr. Hull"), Assistant Dean for Graduate Medical Education at IU during the relevant time period, a letter describing her investigation and other examples of Plaintiff's misconduct. Def. Ex. 31. Dr. Logio included her notes regarding Plaintiff's response to the allegations and the response submitted by Plaintiff's attorney on his behalf. Def. Ex. 1, ¶ 5. In a subsequent letter to Dr. Hull, Dr. Logio offered a recommended course of action. Although a majority of Program Directors recommended termination of Plaintiff's contract, Dr. Logio requested, among other things, probation and completion of a sensitivity training program. Def. Ex. 32. In her letter, Dr. Logio made reference to her perception of a "clear trend of unprofessionalism, be it in inappropriate behavior with women, or a lack of integrity and honesty." *Id.*

Lillian Charleston of the Office of Affirmative Action performed a separate investigation of the same incidents. Def. Ex. 5, ¶¶ 7-11. Ms. Charleston interviewed Plaintiff, the complaining nurses, and the nursing supervisor. *Id.* She provided the specific allegations to Plaintiff and afforded him the opportunity to respond. *Id.* Plaintiff denied the allegations made against him. *Id.* Ms. Charleston wrote a letter to Dr. Hull with the following findings:

> Based on the information gathered in this investigation, it is the opinion of the Affirmative Action Office that inappropriate conduct of a sexual nature occurred. The preponderance of statements from the complainants outweighs Dr. Kapoor's denial that the behavior did not occur. While there were no reports of requests for sexual favors, each stated that he invaded their personal space, and either touched or

5

>    gestured towards their bodies in inappropriate ways. As a consequence, I support Dr. Logio's [recommendations]. Moreover, if there is a future complaint of sexual harassment against Dr. Kapoor which is found to have merit, I recommend more stringent discipline up to and including termination.

*Id.* at ¶¶ 15-16.

Finding that Plaintiff had "behaved in an inappropriate fashion in the workplace" and that Plaintiff's actions amounted to "a breach of the School of Medicine Policies and Procedures for House Staff and Plaintiff's Letter of Appointment," Dr. Hull adopted Dr. Logio's proposed recommendations for disciplinary action. Def. Ex. 1, ¶ 9.

In December 2004, while Plaintiff was on probation, a nurse administrator reported to a Chief Resident that Plaintiff failed to return pages promptly. Def. Ex. 23. She also reported that Plaintiff had been rude to the nurses in connection with patient care. *Id.* During holiday coverage at University Hospital, three incident reports by two separate nurses were made on his first night on call. *Id.* One nurse reported her concern over not being able to wake Plaintiff to discuss a patient's treatment. *Id.* The second nurse reported two separate incidents where Plaintiff allegedly failed to examine and evaluate two different patients. *Id.*

On January 12, 2005, the Resident Evaluation Committee reviewed Plaintiff's entire performance record. Def. Ex. 2A, ¶ 17. After reviewing his record, including Plaintiff's responses to all allegations, the Committee voted unanimously to dismiss Plaintiff from the Residency Program. *Id.* Dr. Logio informed Plaintiff of the decision and of his rights. Def. Ex. 2A, ¶ 18. On January 25, 2005, Dr. David Crabb ("Dr. Crabb"), Chairman of the Resident Evaluation Committee, and Dr. Logio wrote a letter to Dr. Hull explaining the Committee's recommendation. Def. Ex. 2A, ¶ 19. On February 15, 2005, Dr. Hull informed Plaintiff that he was recommending his dismissal

6

to the Dean of the School of Medicine. Def. Ex. 1, ¶ 12. In that letter, Dr. Hull provided Plaintiff with a copy of IU's Procedures for Discipline and Termination of House Staff. *Id.*

Plaintiff subsequently requested an appeals hearing. Dr. Hull sent Plaintiff a letter confirming Plaintiff's request and instructing Plaintiff that his hearing was scheduled for March 30, 2005. Def. Ex. 1, ¶ 15. Dr. Hull advised Plaintiff that Plaintiff was entitled to present witnesses and written evidence at the hearing, and that he was entitled to representation. *Id.* The letter also notified Plaintiff that his failure to appear at the hearing would be deemed a waiver of his right to a hearing. *Id.* On March 29, 2005, by his attorney, Plaintiff waived the appeals hearing. Def. Ex. 20. Plaintiff did not appear for a hearing on March 30, 2005. Def. Ex. 1, ¶ 16.

After Plaintiff left IU's Medical Residency Program, it received numerous requests for information from prospective employers and state licensing authorities regarding Plaintiff and the circumstances surrounding his departure from IU. Def. Ex. 2A, ¶ 21. Dr. Logio, as Program Director, was in charge of responding to the requests. *Id.* Prior to responding, IU requested that Plaintiff execute a release and authorization, it contends, to protect itself from future litigation. *Id.* at ¶ 22. Plaintiff complied with IU's request, and now argues that IU required the release in retaliation for filing a charge with the Equal Employment Opportunity Commission (the "EEOC"). *Id.* at ¶ 23, Pl.'s Br. at 48-50.

## II. STANDARD

Summary judgment is granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ("Rule 56(c)"). An issue is genuine

only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Wollin v. Gondert*, 192 F.3D 616, 620 (7th Cir. 1999); *Schroeder v. Bart*, 969 F. 2d 421, 423 (7th Cir. 1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *See Wollin*, 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992). In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Wollin*, 192 F.3d at 621. If a reasonable trier of fact could find for the opposing party, then summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

### III.  DISCUSSION

Plaintiff asserts the following claims: (1) unlawful discrimination on the basis of national origin and race; (2) retaliation for engaging in a protected activity, (3) deprivation of Due Process under color of state law; and (4) breach of contract under Indiana common law. The Court discuss below each claim in turn.

## A.  UNLAWFUL DISCRIMINATION BASED ON
## NATIONAL ORIGIN AND RACE[1]

With no direct evidence of unlawful discrimination, these claims are properly analyzed under the familiar *McDonnell Douglas* burden shifting approach. *See McDonnell Douglas Corp. v. Green*, 441 U.S. 792 (1973).  Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of race or national origin discrimination. *See Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).  To do so, Plaintiff must establish that: "(1) he was a member of protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of his protected class were treated more favorably." *Id.* (citing *Wells v. Unisource Worldwide, Inc.*, 289 F. 3d 1001, 1006 (7th Cir. 2002)).  If Plaintiff establishes a *prima facie* case, the burden of production shifts to IU to articulate a legitimate, nondiscriminatory reason for its employment decision.  *Id.*  Plaintiff must then demonstrate that IU's articulated reason is merely a "pretext" for race and national origin discrimination.  *Id.*  Throughout this burden shifting analysis, Plaintiff retains the ultimate burden of proving that IU intentionally discriminated against him. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

Plaintiff's claims based upon race and national origin discrimination must fail because Plaintiff has not presented evidence that he was meeting IU's legitimate performance expectations. IU has shown that throughout the duration of Plaintiff's residency at IU, dozens of complaints were lodged by over twenty different individuals.  These complaints came from staff, physicians, peers,

---

[1] Plaintiff asserts these claims under both Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.  Because the same analysis applies for both, these claims are discussed together in this section. *See Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

and patients. Although Plaintiff admits that these complaints were lodged, he disputes the accuracy of the facts as reported in those complaints. Nonetheless, the factual discrepancies raised by Plaintiff do not create genuine issues of material fact.

IU received at least four reports from female workers that Plaintiff had made inappropriate physical contact with them. One female reported that Plaintiff grabbed her scarf and on another occasion told her "she looked good." Def. Ex. 9, ¶ 4. Plaintiff does not deny touching the woman's scarf or making the comment. Def. Ex. 6B, at 57-58. A second female nurse complained that Plaintiff touched her buttocks on two separate occasion. Def. Ex. 14, ¶¶ 4-5, 9. Another complained Plaintiff grabbed her identification badge that was placed between her breasts. Yet another nurse reported that Plaintiff ran a pen up her leg toward her groin. *Id.* Although Plaintiff denied these allegations, the Affirmative Action Office investigated the complaint and found that Plaintiff had engaged in unwelcome sexual misconduct. Def. Ex. 5, ¶¶ 15-16.

Additionally, IU provided multiple different examples of what it considered poor performance and substandard professionalism by Plaintiff. Dr. Scherschel received several reports or complaints regarding Plaintiffs inappropriate conduct and unprofessional behavior. Def. Ex. 9, ¶¶ 5-6. Complaints from patients and coworkers are sufficient foundation for IU's employment decision even though Plaintiff had been evaluated average or above on some evaluations. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (stating that the plaintiff's completion of assignments "has no bearing on whether she met [the employer's] expectations regarding employee conduct"). The *Fane* court held that, even though the plaintiff employee produced evidence that she performed her work and did not have any prior disciplinary warnings, she could not overcome the employer's showing that she did not meet the employer's legitimate expectations. *Id.* The Seventh

Circuit stated that a client's complaint about the plaintiff's communication style, and the plaintiff's improper behavior toward a senior partner demonstrate that plaintiff did not meet the employer's legitimate expectations. *Id.* Here, Plaintiff, although showing that he received some positive feedback, cannot overcome the wealth of evidence of his failure to meet IU's legitimate expectations. Much like in *Fane*, multiple people complained about his performance and professionalism. Indeed, his record of misconduct is much more extensive than that of the plaintiff in *Fane*.

Plaintiff contends reports that his performance was substandard should have been balanced with evaluations that rated him as performing well. However, Plaintiff's own self-assessment of his job performance is irrelevant. *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 684 (7th Cir. 2007). Moreover, although some evaluations of Plaintiff's performance rated him at least average or better, others did not. Def. Ex. 2A, ¶ 11. Considering the volume of complaints regarding Plaintiff's professionalism, and multiple reports of inappropriate physical contact with female coworkers, IU was well within its discretion to give more weight to the complaints and evaluation of his substandard performance than to other positive evaluations. *Fane*, 480 F.3d at 540. Moreover, the Court will not second guess IU's business judgment to rely on these reports to terminate their relationship with Plaintiff because it is not the Court's place to act as a super-personnel department. *See Gates v. Caterpillar Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). Although Plaintiff denies the events or argues that the facts did not exactly happen as they were reported to IU, the relevant point is not whether the events actually occurred as reported, but rather whether IU relied on those reports in makings it decision to terminate its relationship with Plaintiff. *See, e.g.*,

11

*Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006).[2]

The overwhelming evidence presented to the Court suggests that Plaintiff did not meet IU's legitimate employment expectations. IU received report after report regarding Plaintiff's unprofessional behavior, by patients and colleagues alike, both before and after Plaintiff was placed on probation. Although he may disagree with IU's finding, multiple people reviewed his personnel record, including an independent fourteen-member committee, and found that Plaintiff was not meeting their employment expectations. Def. Ex. 2A, ¶ 17. Therefore, Plaintiff not carried his burden to show a material question of fact on this element of his *prima facie* case. IU is entitled to summary judgment on Plaintiff's claims for race and national origin discrimination under Title VII and § 1981. Fed. R. Civ. P. 56(c).

### B. RETALIATION CLAIM

Plaintiff alleges in his Complaint that IU retaliated against him for filing a charge with the EEOC by requiring him to sign releases before IU would answer requests from potential employers and state licensing authorities. Employees pursuing claims for unlawful retaliation must prove unlawful discrimination by either the direct or indirect method. *See Williams v. Waste Mgmt. of Ill.*, 361 F. 3d 1021, 1031 (7th Cir. 2004).

Plaintiff contends he has satisfied the direct method of proof, which requires Plaintiff to show

---

[2] For this reason, Plaintiff's argument that Defendants' evidence is inadmissible hearsay must fail. Hearsay is defined by Federal Rule of Evidence 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." IU does not offer any of the statements made by individuals reporting Plaintiff's misconduct for their truth, but rather only for the fact that the report was made. Therefore, the statements are not hearsay. Fed. R. Evid. 801(c).

that: (1) Plaintiff engaged in statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. *See id.* However, Plaintiff has simply not produced any direct evidence that IU intentionally required Plaintiff to sign the releases because Plaintiff filed a charge with the EEOC. Therefore, Plaintiff must show a *prima facie* case of retaliation under the indirect method of proof to survive summary judgment. *See id.*

Under the indirect method of proof, Plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to IU's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See id.* The Court agrees with IU that Plaintiff has failed to establish a *prima facie* case of retaliation because Plaintiff has not shown he was treated differently than similarly situated employees who did not engage in protected activity. A similarly situated employee is one who is "directly comparable to plaintiff in all material aspects." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002). No other third-year medical residents had multiple professionalism issues like those of Plaintiff and were treated differently. Plaintiff has thus failed to show a material question of fact that he was treated differently than a similarly situated employee. Plaintiff's claim that IU retaliated against him fails for this reason. *See Williams*, 361 F.3d at 1031.

Having failed to establish a *prima facie* case under either the direct or indirect method of proof, Plaintiff's claim for unlawful retaliation must fail as a matter of law. *See id.* IU is entitled to summary judgment as to this claim. Fed. R. Civ. P. 56(c)

## C.  DUE PROCESS CLAIM

Plaintiff contends that IU violated 42 U.S.C. § 1983 by depriving him of due process under color of state law because he was not provided an appeals hearing.  Pl.'s Br. at 50.  Due process requires only notice and an opportunity to be heard.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985).  Here, IU has demonstrated that it gave Plaintiff ample notice and an opportunity to be heard at a hearing scheduled for March 30, 2005.  Def. Ex. 1, ¶¶ 15-16.  Plaintiff was instructed that failure to appear would constitute waiver of his right to an appeal.  *Id.* Nonetheless, Plaintiff failed to appear and IU now asserts that Plaintiff waived his right to an appeal.  Plaintiff seemingly does not dispute the notice of hearing and the opportunity to be heard, but rather that, procedurally, IU failed to plead waiver and thus cannot now rely on it in defense of Plaintiff's due process claim.

The Court disagrees with Plaintiff.  Even assuming IU was required to plead waiver as an affirmative defense, IU is excused from its failure to plead waiver "so long as the record confirms that the plaintiff had adequate notice of the defense and was not deprived of the opportunity to respond."  *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997).  Although IU did not specifically plead waiver as an affirmative defense, it did plead that Plaintiff failed to exhaust administrative remedies.  At the very least, Plaintiff was on notice that IU intended to assert that Plaintiff voluntarily chose to not pursue an appeal.  Furthermore, the evidence clearly indicates that Plaintiff was afforded sufficient notice and an opportunity to be heard. Therefore, as to Plaintiff's due process claim, there are no genuine issues of material fact and IU is entitled to summary judgment.  Fed. R. Civ. P. 56(c).

## D.  BREACH OF CONTRACT CLAIM

Finally, Plaintiff alleges that IU breached it contractual obligations to him under Indiana common law.  Under Indiana law, the essential elements of a breach of contract action are existence of a contract, defendant's breach of that contract, and damages.  *See Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000).  Plaintiff contends the contract at issue here is the Letter of Appointment.  Pl.'s Br. at 47.  Additionally, the Plaintiff argues that the Letter of Appointment incorporates IU's sexual harassment policy.  *Id.*  IU asserts that the sexual harassment policy was not part of the contract.  Def. Br. at 33.  Moreover, IU contends that even if the sexual harassment policies were incorporated by the Letter of Appointment, it met its obligations under the policies.  Def. Reply Br. at 18.

The Court finds that Plaintiff's breach of contract claim is without merit.  Whether or not the letter of appointment incorporated IU's sexual harassment policies, it is undisputed that the actual terms of the Letter of Appointment are part of the agreement between the parties.  Def. Ex. 22.  Plaintiff simply did not comply with his obligations under the contract.  IU was presented with multiple accounts of Plaintiff's failure to perform well in the residency program.  *See, e.g.*, Def. Ex. 9, ¶¶ 5-7.  Additionally, Plaintiff was afforded ample opportunity to respond to the accusations against him.  Def. Ex. 1, ¶ 15, Def. Ex. 2A, ¶¶ 14-15, Def. Ex. 5, ¶ 8.  He was also afforded the opportunity to appeal his dismissal.  Therefore, the Court agrees with IU that it complied with its obligations under the Letter of Appointment.  Because the Court finds that no reasonable jury could find that IU breached its contract with Plaintiff, IU is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.  CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment as to all of Plaintiff's claims is **GRANTED**.

IT IS SO ORDERED this 25th day of August, 2008.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distributed to:

Kenneth E. Lauter
HASKIN LAUTER  & LARUE
klauter@hlllaw.com

Jay Meisenhelder
HASKIN LAUTER  & LARUE
jmeisenhelder@hlllaw.com

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com